fUNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | |
|---|---|
| THOMAS ADAMS, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Case No. |
| v. ) | 5:16-cv-00098-JMH |
| ) | |
| NATURE'S EXPRESSIONS ) | **MEMORANDUM OPINION** |
| LANDSCAPING INC., ) | **AND ORDER** |
| ) | |
| Defendant. ) | |

\*\*\*

## I. INTRODUCTION

When employees work more than forty hours in a week, they expect overtime pay. Under the Fair Labor Standards Act ("FLSA"), employees working these hours are entitled to time-and-a-half, unless the Act exempts them. Employees at Nature's Expressions Landscaping, Inc. ("NEL") claim they have worked more than forty hours per week. They are not exempt from the FLSA. And now they want their overtime pay. So they have filed a collective action in this Court asking for their money.

But NEL argues it owes nothing. Some Plaintiffs, according to NEL, never worked for the company. Others work under contracts specifically spelling out overtime and straight time pay. In fact, NEL claims the company compensates some employees above what the FLSA requires. These employees, NEL argues, do not understand how their own wages are calculated. And finally NEL argues that some

1

employees trying to join this action simply filed too late. So NEL now asks for Summary Judgment or, in the alternative, Decertification of four groups of plaintiffs. Plaintiffs have responded [DE 43], and Defendant filed a reply [DE 45] making the matter ripe for review.

For the reasons stated herein, Defendant's Motion for Partial Summary Judgment is **GRANTED IN PART, DENIED IN PART, and DENIED IN PART AS MOOT**. Defendant's motion for Decertification is **DENIED**.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Thomas Adams, Adam Allnut, Frankie Anderson, Steven Atwood, Charles Cook, John Heska, and Ron Stewart filed this action on March 30, 2016 seeking unpaid overtime wages under the FLSA. [DE 1]. Plaintiffs worked for NEL, a landscape architecture firm that "creates and constructs outdoor living spaces for clients throughout central Kentucky." [DE 1-1 at p. 7-8, ¶17]. NEL pays employees a set rate per day. [*Id.* at p. 8, ¶18]. Plaintiffs allege that this compensation scheme violates the FLSA because it does not account for overtime hours. [*Id.* at p. 8-14].

As the Plaintiffs describe it, NEL assigns each employee a daily wage based on his position and duties. [*Id.* at p. 8-9, ¶20]. Each employee is required to work a certain number of hours per day, which is divided into "quarter days." [*Id.* at p. 9, ¶22]. NEL tracks the number of hours worked by each employee, and then

2

rounds that number to the nearest quarter day. [*Id.*].  NEL pays
the employee the sum equal to the employee's agreed upon day rate,
prorated by quarter days worked. [*Id.*].  For example, NEL might
require an employee to work ten hours per day and pay that employee
$160 per day, based on the ten hours of work. [*Id.* at p. 10, ¶23].
But on any given day, if that employee works only 7.5 hours, his $160
per day would be prorated to three-fourths of the total daily rate.
[*Id.*].  Plaintiffs claim NEL uses this method for all work, even
if employees work more than 40 hours in a week. [*Id.* at p. 12,
¶26].

Put simply, Plaintiffs claim NEL is not paying time-and-a-
half for overtime.  Plaintiffs have suspected as much since early
2016, when Ron Stewart and Steven Atwood filed administrative
complaints with the Kentucky Labor Cabinet ("KLC") seeking unpaid
overtime wages. [*Id.* at p. 15, ¶36].  The KLC began investigating
NEL's compensation practices, and even visited NEL premises.
[*Id.*].  Although Stewart and Atwood later withdrew their
complaints, the investigation remains pending, but its status is
unknown. [DE 1-1 at p. 15; 24].

A short time after filing with the KLC, Stewart and Atwood,
along with the other named Plaintiffs, filed this action in
Jessamine Circuit Court seeking overtime wages under the FLSA. [DE
1-1].  Plaintiffs also filed retaliation claims under the FLSA and
state-law claims under the Kentucky Work and Hour Act ("KWHA").

3

[*Id*.].   NEL promptly removed the case to this Court on the basis of federal question and supplemental jurisdiction. [DE 1].

After the Defendant filed its Answer, the Plaintiffs moved pursuant 29 U.S.C. § 216(b) to conditionally certify this case as a collective action. [DE 14].   Under that provision of the FLSA, similarly situated plaintiffs may bring their cases together as a collective. 29 U.S.C. § 216(b).

The Court granted Plaintiffs' motion in a November 1, 2016 Memorandum Opinion and Order. [DE 26].   The Order approved Plaintiffs' proposed notice and opt-in consent forms. These forms were sent to the "FLSA Notice Group," which included "all individuals currently or formerly employed by NEL who, within the three-year period preceding the date of this Court's certification Order, were compensated under the 'day-rate' scheme, as that term is described in Plaintiffs' Complaint, and who worked hours in excess of forty (40) during any week throughout the course of their employment." [DE 22 at p. 10].   This group had ninety days to fill out the paperwork and join the class. [*Id*. at p. 11].   All opt-in consent forms would be "deemed to have been filed with the Court the date that they are stamped as received." [*Id*.].   The deadline was set for February 12, 2017. [DE 28-1].   Since that Order issued, many current or former NEL employees have completed and submitted opt-in forms. [DE 27; 28; 29; 30; 31; 32].

NEL argues that several opt-in Plaintiffs either do not meet the criteria to join this collective action or simply do not have a case. [DE 39]. Defendant's motion addresses only opt-in Plaintiffs and not the original Plaintiffs already conditionally certified. [DE 26]. Defendant groups these opt-in Plaintiffs into four categories: (1) persons who never worked for Defendant NEL; (2) persons who opted in to the lawsuit after the expiration of the opt-in period; (3) persons who never worked more than 40 hours in any given week for NEL; and (4) person whose employment agreements state NEL's policy of straight time and overtime pay. [DE 39; 45].

The Court will discuss each group of Plaintiffs and the parties' arguments in turn.

### III. STANDARD OF REVIEW

#### A. *Summary Judgment*

Summary Judgment is appropriate when no genuine dispute as to any material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To prevail on summary judgment, the moving party must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 248 (1986). Thus, the Court

considers "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251—52.

In considering a summary judgment motion, the Court must construe the facts in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255.  Once the moving party has met its burden of production, the nonmoving party must "go beyond the pleadings" through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24.  A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 252.

**B. *Decertification***

"[T]he FLSA authorizes collective actions by any one or more employees for and on behalf of himself or themselves and other employees similarly situated." *Monroe v. FTS USA, LLC*, 860 F.3d 389, 397 (6th Cir. 2017)(quoting 29 U.S.C. § 216(b)).  Similarly situated employees may "opt-into" such suits by "signal[ing] in writing their affirmative consent to participate in the action." *Comer v. Wal-Mart Stores, Inc*., 454 F.3d 544, 546 (6th Cir. 2006).

"The FLA does not define the term 'similarly situated.'" *Tassy v. Lindsay Entm't Enter. Inc*., NO. 3:16-CV-00077-TBR, 2017 WL 938326 (W.D. Ky. Mar. 9, 2017). But Courts in this circuit

"typically bifurcate certification of FLSA collective action cases." *Monroe*, 860 F.3d at 397.  "At the notice stage, conditional certification may be given along with judicial authorization to notify similarly situated employees of the action." *Id.*   Such certification is "by no means final." *Comer*, 454 F.3d at 546-47.  "The plaintiff must show only that his position is similar, not identical, to the positions held by the putative class members." *Id.* (internal quotations omitted).  "[T]his determination is made using a fairly lenient standard, and typically results in conditional certification of a representative class."   *Id.* (stating further that "authorization of notice need only be based on a modest factual showing") (internal quotations omitted).

    "Once discovery has concluded, the district court — with more information on which to base its decision and thus under a more exacting standard — looks more closely at whether the members of the class are similarly situated." *Monroe*, 860 F.3d at 397.  The final-certification decision depends upon "a variety of factors, including the factual and employment settings of the individual[] plaintiffs, the different defenses to which the plaintiffs may be subject on an individual basis, [and] the degree of fairness and procedural impact of certifying the action as a collective action." *O'Brien v. Ed Donnelly Enter., Inc.*, 575 F.3d 567, 584 (6th Cir. 2009) (internal quotations omitted), *overruled on other grounds by Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016).

7

## IV. DISCUSSION

"Congress enacted the FLSA in 1938 with the goal of 'protect[ing] all covered workers from substandard wages and oppressive working hours.'" *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2162 (2012) (quoting *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981)); *see also* 29 U.S.C. § 202(a). Overtime pay makes up a critical aspect of the FLSA. 29 U.S.C. §207(a). This "obligates employers to compensate employees for hours in excess of 40 hours per week at a rate of 1 ½ times the employees' regular wages." *Christopher*, 132 S. Ct. at 2162. Employees can enforce this requirement through a collective action, which authorizes employees to sue on their own behalf and for all similarly situated persons. 29 U.S.C. § 216(b).

### A. Group One: Employee Who Never Worked for NEL

No one named Dimitri Roskolov ever worked for NEL. [[DE 39 at p. 4]. Plaintiffs' counsel admits as much. [DE 43 at p. 4]. Indeed, Roskolov could not have worked at NEL because he does not exist. [DE 39 at p. 4; 43 at p. 4]. Yet, Plaintiffs' counsel listed a "Dimitri Roskolov" as an opt-in Plaintiff to this lawsuit. [DE 27-2]. Defendant claims that because the parties agree that a Roskolov never worked for NEL, no genuine issue of material fact exists as to his claims. [DE 39].

8

Plaintiffs' counsel attributes the mix up to an illegible signature and an unfortunately named e-mail address. [DE 43 at p. 4]. William "Chad" Austin is the real person who signed the consent form on November 16, 2016. [*Id.*]. When Plaintiffs' counsel received the form, the form did not include a printed name. [*Id.*]. The signature was illegible. [*Id.*]. But the e-mail address provided included the name "Dimitri Roskolov." [*Id.*]. Plaintiffs' counsel assumed the sender's name was, in fact, Dimitri Roskolov. It was not.

Even if the Court were inclined to grant Defendant's Motion, doing so would have no effect on Austin's legitimate claim. And allowing Austin to join this collective action does not prejudice NEL since Austin could file a new lawsuit himself. Plaintiffs did not engage in any tactical maneuvering to NEL's disadvantage. And Austin – the real party in interest – returned a timely and proper consent form. The Court sees no reason to punish Austin for a mistake that has since been corrected.

Defendant's Motion for Summary Judgment as to the claims of Dimitri Roskolov are **DENEID**. Plaintiffs will be permitted to substitute William "Chad" Austin for Roskolov in this collective action.

B. **Group Two: Persons Who Opted in to the Action after the Expiration Date**

9

"The FLSA provides the procedure for potential plaintiffs to opt-in to a collective action, but does not specify when the potential plaintiff must opt-in." *Lykins v. First Acceptance Corp.*, No. 3:13-cv-01374, 2015 WL 2367155, at *1 (M.D. Tenn. May 18, 2015)(quoting *Kimbrel v. D.E.A. Corp.*, No. 3:14-cv-161-TAV-CCS, 2015 WL 1396898, at *2 (E.D. Tenn. Mar. 26, 2015)). The trial court sets opt-in deadlines. *Heaps v. Safelite Solutions LLC*, NO. 2:1—cv-729, 2011 WL 6749053, at *1 (S.D. Ohio Dec. 22, 2011). The FLSA "does not 'provide a standard under which a court should consider whether to include opt-in plaintiffs whose consent forms are filed after the court-imposed deadline has passed.'" *Id.* (quoting *Ruggles v. Wellpoint, Inc.*, 687 F. Supp. 2d 30, 37 (N.D.N.Y. 2009)). But district courts "ha[ve] authority to allow late opt-ins." *Hurt v. Commerce Energy, Inc.*, No. 1:12-CV-758, 2014 WL 49571, at *1 (N.D. Ohio Feb. 6, 2014).

Courts use a five-factor test to determine whether to allow untimely opt-ins. *See, e.g.*, *Lykins*, 2015 WL 2367155, at *1. These factors are: (1) whether good cause exists for the late submissions; (2) prejudice to the defendant; (3) how long after the deadline passed the consent forms were filed; (4) judicial economy; and (5) the remedial purposes of the FLSA. *Id.*; *see also Kimbrel*, 2015 WL 1396898, at *2; *Hurt*, 2014 WL 49571, at *1; *Heaps*, 2011 WL 6749053, at *1. Courts balance these factors; no single

10

factor is dispositive. *See Lykins*, 2015 WL 2367155, at *2; *Heaps*, 2011 WL 6749053, at *2.

Plaintiffs Harry Sussman, Andy Dwyer, and Christopher Becknell ("Group Two Plaintiffs") filled out and signed consent forms before the opt-in deadline. [DE 32-1; 32-2; 32-3]. Sussman completed his form on January 30, 2017 [DE 32-1], while Dwyer and Becknell signed their forms on February 10. [DE 32-2; 32-3]. Plaintiffs' counsel was traveling during this time and did not file the consent forms until February 27 – two weeks after the opt-in deadline. [DE 32]. Defendant requests that the Court deny Group Two Plaintiffs' request to join this action. [DE 39].

The analysis here supports allowing the Group Two Plaintiffs to opt in. First, good cause exists for the late filings of Sussman and Dwyer. The Defendant failed to initially provide Plaintiffs' counsel with correct addresses for Sussman and Dwyer. [DE 43 at p. 6]. Defendant does not explain this error in its reply to Plaintiffs' brief. [DE 45]. At least one other court has ruled that "failure to provide an up-to-date address for [opt-in plaintiff] supports finding good cause for the delay." *Kimbrel*, 2015 WL 1396898, at *3. This Court agrees. Armed only with former addresses for Sussman and Dwyer, Plaintiffs' counsel was delayed in contacting Sussman and Dwyer. This amounts to just cause. As for Becknell, the Court finds no good cause for the late filing. But as mentioned above, this factor is not dispositive, and courts

11

in the Sixth Circuit have permitted late-filing plaintiffs to join collective actions even without good cause. *See Lykins*, 2015 WL 2367155, at *3 (ruling opt-in plaintiffs could join action absent a showing of good cause); *Hurt*, 2014 WL 494571, at *1 (same); *Heaps*, 2011 WL 6749053, at *2 (same).

Second, Defendant will suffer little, if any, prejudice from the inclusion of the Group Two Plaintiffs. These individuals could, if denied admittance to this collective action, file their own lawsuit raising nearly identical claims. This weighs in favor of allowing the plaintiffs to join. *See Kimbrel*, 2015 WL 1396898, at *3. The Defendant also knew for more than three months that Sussman, Dwyer, and Becknell sought to join this action. Thus, this case presents no unfair surprise. Defendant faces no large discovery burden since it has already produced wage and hour documents for these particular individuals. [DE 43 at p. 8-9]. And increasing the collective action size by about ten percent does not rise to the level of prejudice warranting dismissal. *See Kimbrel*, 2015 WL 1396898, at *3 (holding that a fifty percent increase in class size not prejudicial); *Heaps*, 2011 WL 6749053, at *2 (holding that a ten percent increase in class size not prejudicial); *Abubakar v. Co. of Solano*, No. Civ S-06-2268, 2008 WL 550117, at *2 (E.D. Cal. Feb. 27, 2008) (holding that a 15 percent increase class size not prejudicial).

12

Third, Group Two Plaintiffs filed their consent forms only two weeks after the court-imposed deadline. [DE 32]. This falls well within the time range that other courts have allowed for late filings. *See Lykins*, 2367155, at *3 ("the majority of courts permitting late opt-ins to join collective actions were faced with a filing delay of no more than one or two months"); *Stevenson v. Great Am. Dream, Inc*., No. 1:12-CV-3359-TWT, 2014 WL 4925597, at *2 (N.D. Gal. Sept. 30, 2014)(plaintiffs allowed to join after filing two months late); *Kimbrel*, 2015 WL 1396898, at *3 (plaintiffs allowed to join after filing several weeks late); *Heaps*, 2011 WL 6749053, at *2 (plaintiffs allowed to join after filing "a few months after the deadline").

Fourth, allowing Group Two Plaintiffs to opt-in serves judicial economy. The analysis here largely overlaps with factor two: dismissing the Group Two Plaintiffs would lead to identical lawsuits. The Court finds it better to resolve all the instant claims in one action. *See Hurt*, 2014 WL 494571, at *2 ("there is little economy in spawning identical FLSA lawsuits").

Fifth, permitting the opt-ins best serves the remedial purposes of the FLSA. "A generous reading, in favor of those whom congress intended to benefit from the law, is also appropriate when considering issues of time limits and deadlines." *Lykins*, 2015 WL 2367155, at *3; *Kimbrel*, 2015 WL 1396898, at *3; *Hurt*, 2014 WL 494571, at *2; *Heaps*, 2011 WL 6749053, at *2. Here, all

13

three Group Two Plaintiffs filled out and signed their consent forms before the deadline. It would be antithetical to the purposes of the FLSA to punish these individuals – whom Congress intended to benefit – based on counsel's failure to timely file the forms with the Court.

Finally, the Court will address Defendant's argument that, as a threshold matter, the text of the FLSA blocks late-filing opt-in employees from becoming members of the class. [DE 39 at p. 4-5]. Defendant directs the Court to 29 U.S.C. § 256 for support. [*Id.*]. That provision states that "[i]n determining when an action is commenced for the purposes of section 255 of this title" an action is considered commenced for an opt-in plaintiff "on the . . . date on which such written consent is filed in the court in which the action was commenced." 29 U.S.C. § 256. Section 255 outlines the statute of limitations for FLSA actions. Thus, § 256 tells the Court that, "for the purposes of" determining whether the statute of limitations has run, an action is considered commenced for opt-in plaintiffs on the date that written consent is filed with the court.

The statute of limitations is not at issue here. Still, Defendant argues that the language of § 256 "indicates a clear Congressional intent that the controlling action for inclusion in a FLSA collective is the filing, and not the signing, of the opt-in consent." [DE 39 at p. 5]. Defendant does not direct the Court

14

to a single case in support of this proposition.  Nor can the Court find one. Indeed, the Defendant admits that courts generally follow the five-factor test analyzed above. [DE 39 at p. 5].  Although Defendant does not say so explicitly, its argument would require this Court to hold that every other court that has previously faced this issue has been wrong.  This Court is not prepared to do so. The plain text of § 256 applies "for the purposes of" determining the statute of limitations, which is not before the Court.

Defendant's Motion for Summary Judgment or in the alternative Decertification as to Group Two Plaintiffs is **DENIED**.

### C. Group Three: Persons Who Never Worked More Than Forty Hours

After Defendant moved for summary judgment as to three employees it claimed never worked more than forty hours per week, the parties came to agreements regarding each plaintiff.

Specifically, Plaintiffs agree that Patrick Johnson and Mark Comley never worked more than forty hours for NEL and dismissal is appropriate. [DE 43 at p. 12].  Because there is no genuine issue of material fact involving these plaintiffs, the Defendant's Motion for Summary Judgment as to Johnson and Comley is **GRANTED.** Further, Defendant has withdrawn its Motion for Summary Judgment as to Joseph Sams after discovering records of weeks in which Sams worked more than forty hours. [DE 45 at p. 3]. Accordingly, Sams is a proper opt-in plaintiff in this lawsuit, and because defendant

seeks withdrawal of its summary judgment motion, that motion is **DENIED AS MOOT**.

D. **Group Four: Persons Whose Employment Agreements State NEL's Policy of Straight and Overtime Pay**

Under the FLSA, employers must pay employees an overtime rate of at least 1.5 times the regular rate for hours worked in excess of forty hours per week. 29 U.S.C. § 207(a)(1). The "regular rate" is defined in the FLSA regulations:

> The "regular rate" of pay under the Act cannot be left to a declaration by the parties as to what is to be treated as the regular rate for an employee; it must be drawn from what happens under the employment contract. The Supreme Court has described it as the hourly rate actually paid the employee for the normal, nonovertime workweek for which he is employed - an "actual fact"

> 29 C.F.R. § 778.108

The regular rate includes "all remuneration for employment paid to, or on behalf of, the employee" subject to statutory exceptions. 29 U.S.C. § 207(e). This encompasses "the hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed." *Walling v. Youngerman-Reynolds*

16

*Hardwood, Co.*, 325 U.S. 419, 424 (1945). In determining the regular rate, the Court must consider how the employer actually, in fact, pays the employee; parties cannot stipulate the rate. *Bay Ridge Operating Co. v. Aaron,* 334 U.S. 446, 462-63 (1948). The regular rate is calculated on a per hour basis, even if an employee is not paid by the hour. 29 C.F.R. § 778.109.

The FLSA excludes from the regular rate any "extra compensation provided by a premium rate paid for certain hours worked by the employee in any day of workweek because such hours are hours worked in excess of eight in a day." 29 U.S.C. § 207(e)(5); 29 C.F.R. § 778.202. The premium rate paid for work in excess of eight hours in a day is "creditable toward overtime compensation." 29 U.S.C. § 207(h)(2). In other words, where an employee is paid a premium rate for hours worked in excess of eight in a given day, that pay: (1) is excludable from the regular rate calculation, and (2) counts as overtime payments to satisfy FLSA requirements. *See, e.g., Smiley v. E.I. Dupont De Nemours and Co.*, 839 F.3d 325, 333 (3d Cir. 2016)(finding that premium payments under § 207(e)(5)-(7) are "a kind of overtime compensation, and thus need not be added to the regular rate. Likewise, such compensation may be credited against the Act's required overtime pay."); *Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 914 n.19 (9th Cir. 2004); *O'Brien v. Town of Agawam*, 350 F.3d 279, 289 n.18 (1st Cir. 2003); *Herman v. Fabri-Centers of Am., Inc.*, 308 F.3d

580, 587 (6th Cir. 2002) ("when the FLSA was amended in 1949, 29 U.S.C. §§ 207(e)(5), (6), and (7) excluded certain premium payments from the computation of overtime, while 29 U.S.C. § 207(h)allowed those payments to be credited against FLSA overtime.").

Defendant moves for summary judgment or, in the alternative decertification, as to opt-in plaintiffs with agreements that NEL claims "clearly state[] NEI's policy of straight time and overtime pay." [DE 39 at p. 7]. NEL argues that these "Group Four" opt-in plaintiffs – Justin Sanchez, Jeremy Thompson, and Elijah Gawthorp – signed contracts that break down straight and overtime pay in compliance with FLSA. [DE 45 at p. 4]. Since the filing of this lawsuit, NEL has changed the language of its employment contracts to more clearly delineate how it pays employees. [DE 39-1]. The Group Four Plaintiffs work under these newly worded agreements. Because the contracts explain overtime pay, and NEL has outlined how these particular plaintiffs have received overtime for hours worked in excess of eight per day, Defendant argues there is no genuine issue of material fact.

Plaintiffs make two responses to Defendant's arguments. First, they argue summary judgment is unwarranted because the Group Four Plaintiffs "were still denied the overtime pay which they are lawfully owed, despite being compensated under Defendant's revised compensation scheme." [DE 43 at p. 13]. In particular, Plaintiffs argue the new compensation system at NEL violates two FLSA

regulations: (1) the required overtime computation method for "day rate" compensation under 29 C.F.R. § 778.112, and (2) the "split-day" scheme prohibited by 29 C.F.R. § 778.501. Second, plaintiffs argue decertification is premature because discovery has not been fully completed. [*Id.*].

NEL claims it pays a per-day overtime premium of time-and-a-half to Group Four Plaintiffs for hours worked in excess of eight. If true, those premiums would be excludable from the regular rate and satisfies the FLSA overtime payment requirement. 29 U.S.C. § 207(e)(5); 29 C.F.R. § 778.202. The Group Four Plaintiffs' contracts state that payment is based on an expected eleven-hour workday. [DE 39-1]. As part of that eleven-hour day, NEL pays each employee a regular rate for the first eight hours and an overtime rate for hours worked in excess of eight. [*Id.*]. In other words, NEL claims it pays overtime on a daily basis. [DE 45-2 at p. 5]. For example, Thompson's contract calls for regular pay of $10.40 per hour and overtime pay of $15.60 per hour. [DE 39-1 at p. 6]. The contract states that Thompson will "receive a weekly paycheck based on $130/day." [*Id.*]. This $130 breaks down as follows: for the first eight hours, Thompson receives $10.40 per hour, for a total of $83.20. The next three hours – hours worked in excess of eight per day and thus "overtime" – NEL pays Thompson $15.60 per hour, for a total of $46.80. Added together, the regular pay ($83.20) and overtime pay ($46.80) come to a total of

$130 – the same amount NEL lists as Thompson's expected daily earnings.  The contracts for Sanchez and Gawthorp, while containing different numbers, follow the same methodology. Defendants argue that this contractual arrangement does not violate the FLSA.

The FLSA regulations provide guidance on how to calculate the regular rate in particular situations, including when an employer utilizes a "day rate" scheme, or a "split-day" plan. 29 C.F.R. §§ 778.112; 778.501.  We start with the Plaintiffs' claim that Defendant has failed to follow the proper payment method under a "day rate" scheme. [DE 43 at p. 14].

**(i)    Day Rate Plan**

A "day rate" occurs when the employee is "paid a flat sum for a day's work . . . without regard to the number of hours worked in the day or at the job." 29 C.F.R. § 778.112.  When an employer utilizes a day rate, the regular rate – which must be reduced to a per-hour amount – is determined "by totaling all the sums received at such day rates . . . in the workweek and dividing by the total hours actually worked." *Id*.  That number – the "regular rate" – is then divided by two to establish the employee's half-time pay. *Id*.  The half-time pay is added to the employee's hourly pay for each hour worked in excess of forty. *Id*.

Defendant argues that the day rate regulation does not apply to Group Four Plaintiffs because NEL does not pay employees "without regard" to the number of hours worked. 29 C.F.R. §

20

778.112.  Instead, NEL argues it employs a "quarter-day" system in which NEL divides its standard eleven-hour workday into four quarters. [DE 45 at p. 6-8; 45-2 at p. 5].  Whenever an employee works more than 8.25 hours in a day – three-fourths of NEL's eleven-hour workday – NEL rounds up to the nearest quarter day. [DE 45 at p. 8; 45-2 at p. 5].  In practice, NEL gives employees credit for working eleven hours any time that employee worked more than 8.25 hours in a given day. [DE 45 at p. 8].  But if an employee works less than three-fourths of the expected eleven-hour day, NEL credits the employee for only a portion of his daily pay. [DE 45 at p. 7-8].  According to NEL, an employee receives the full per day amount listed in his contract only if he actually works more than three-fourths of the eleven hour workday — in which case, NEL rounds up to eleven hours. [DE 45-2 at p. 5].

NEL offers Sanchez's contract and pay and time records for the week of October 18-22, 2016 to explain how the system works. [DE 39-1; 45-1].  Sanchez's contract lists an expected daily rate of $135 per day with a regular rate of $10.80 per hour and an overtime rate of $16.20 per hour. [DE 39-1 at p. 4].  Sanchez worked three days on the week in question: October 18, 19, and 20. [DE 45-1].  If Sanchez were paid *without regard* to the number of hours worked, he would have made $405 that week, or $135 for each of the three days.  Instead, Sanchez collected $371.23. [*Id.*].  He worked only 7.52 hours on October 20, and because he worked fewer

hours, Sanchez received less pay.  In other words, Sanchez was not paid *without regard* to the number of hours worked. 29 C.F.R. § 778.112.

Still, Plaintiffs spend considerable time arguing that NEL "does not follow [the day rate] methodology in the slightest." [DE 43 at p. 15].  Plaintiffs devote an entire page of their brief to charts showing what Group Four Plaintiffs should be paid under the day-rate regulations. [*Id*. at p. 16].

The Plaintiffs' argument puzzles the Court since, at numerous times and in various filings, Plaintiffs have specifically rejected the notion that NEL utilizes a true day-rate scheme.  In the Complaint, Plaintiffs state "NEL's compensatory scheme . . . differs sharply from the characteristics specified in the Code of Federal Regulations . . . in that NEL does not provide its employees a flat rate without regard to the number of hours worked in a day. Instead, NEL pays employees according to the amount of quarter-days each employee has worked." [DE 1-1 at p. 10, ¶22]. Indeed, Plaintiffs are explicit: "However NEL's compensatory scheme can be characterized, it is not a true day rate as envisioned by the Code of Federal Regulations." [*Id*., ¶24]. Plaintiffs also refer to NEL's payment plan as a "false day rate" [*Id*.] and state that "NEL does not pay a true day rate." [*Id*. at p. 22, ¶25].  In moving for conditional certification, Plaintiffs reiterated this position, arguing that NEL's payment plan "differs

sharply" from the day rate plan "specified in the Code of Federal Regulations, in that NEL does not provide its employees a flat rate without regard to the number of hours worked in a day." [DE 15 at p. 3-4].

Regardless of how Plaintiffs describe it, NEL's pay scheme for Group Four Plaintiffs is not a day rate under 29 C.F.R. § 778.112.  NEL's policy does not pay employees without regard to the number of hours worked.  Employees do not receive their full eleven-hour paycheck when they do not work a full day.  Thus 29 C.F.R. § 778.112 does not apply to these plaintiffs.

**(ii) Split Day Plan**

Employers may not avoid paying overtime by arbitrarily splitting a workday into two artificial rates of pay. *Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37 (1944); *F.W. Stock and Sons Inc. v. Thompson*, 194 F.2d 493, 497 (6th Cir. 1954); 29 C.F.R § 778.501.  These payment plans are "designed . . . to deprive the employees of their statutory right to receive [overtime pay] for all hours worked in excess of the first 40 hours." *Walling*, 323 U.S. at 40.  Under such a plan, the normal workday is "artificially divided into two portions one of which is arbitrarily labeled the 'straight time' portion of the day and the other the 'overtime' portion." 29 C.F.R. § 778.501.  These plans typically include low hourly rates for the first few hours of "straight time" and a higher "overtime" rate for the next few hours. *Id*.  The regulations

23

prohibit employers from paying different rates for half of a shift in an effort to avoid paying overtime. *Id.* "Such a division of the normal 8-hour workday into 4 straight time hours and 4 overtime hours is purely fictitious." 29 C.F.R. § 778.501(b).

This case does not involve a split day as contemplated by the FLSA regulations. Here, Defendant does not pay employees at a regular rate for less than eight hours per day. Instead, Defendant claims it pays a regular rate for the first eight hours, and an overtime rate for hours in excess of eight each day. The FLSA and its regulations expressly permit this arrangement. 29 U.S.C. § 207(e)(5); 29 C.F.R. § 778.202. There is nothing "artificial" about this method of paying employees as several courts have recognized. *See Goulas v. LaGreca*, 557 F. App'x 337, 338 (5th Cir. 2014) (per curiam)(ruling a split of the workday into eight hours of straight time and an additional overtime period "did not show such an impermissible split day plan"); *Parth v. Ponoma Valley Hops. Med. Ctr.*, 630 F.3d 794 (9th Cir. 2010)(ruling that paying eight hours of regular rate and four hours of overtime rate is not a split day); *Conner v. Celanese, Ltd.*, No. V-03-54, 2006 WL 1581923, at *2 (S.D. Tex. June 6, 2006) (finding no split day where "Defendant paid an hourly rate for the first 8 hours worked in every 12-hour shift and then paid time-and-a-half for each hour worked over 8 hours."). Thus, the Court rejects Plaintiffs' argument that NEL's scheme amounts to an impermissible split day.

24

**(iii)  Prorated Daily Payments**

Although the Court finds that NEL's payment scheme does not amount to a "day rate" or "split day," a genuine issue of material fact exists as to whether Group Four Plaintiffs have received proper overtime.

As the Court has already explained, employers may satisfy FLSA overtime requirements by paying daily premium rates to employees for hours worked in excess of eight per day. 29 U.S.C. §§ 207(e)(5), (h)(2); 29 C.F.R §§ 778.108, 778.202.  But if an employee does not receive a premium rate for hours worked in excess of eight hours per day, that amount is included in the regular rate calculation and is not creditable toward overtime. 29 U.S.C. §§ 207(e), (h). So where an employee effectively receives the same hourly rate for the first eight work hours as he does for hours in excess of eight, the employer is not paying a premium. 29 U.S.C. § 207(e)(5). This is true even where the parties attempt to stipulate that the employee receives regular and overtime rates. 29 C.F.R. § 778.108.  The Court must determine the regular rate based on what actually happens under the contract. *Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 461 (1948).

If, as their contracts state, Group Four Plaintiffs do receive time-and-a-half for hours worked in excess of eight per day, then NEL is in compliance with the FLSA.  But if, despite the language of the contracts, NEL pays the Group Four Plaintiffs the same

25

hourly rate regardless of the number of hours they work per day, then NEL does not pay a true premium for hours worked in excess of eight.  Thus, the employees' regular rate would include all of their weekly earnings divided by the total number of hours worked. 29 U.S.C. § 207(e); 29 C.F.R. §§ 778.108, 778.109.  Employees would then be entitled to overtime pay of 1.5 times the calculated regular rate for each hour worked in excess of forty per week. 29 U.S.C. § 207(a)(1).

Plaintiffs allege that NEL's compensation scheme works as follows: First, NEL assigns each employee a daily sum to be paid for a full standard eleven-hour workday.  Second, for each day, NEL determines how many quarter days a particular employee has worked.  Finally, NEL takes the daily sum assigned to a particular employee and multiples it by the number of quarter days that employee has worked.  So, for example, an employee working three quarter days – three-fourths of his standard day – would receive three-fourths of his daily pay.

NEL disputes this characterization of its compensation scheme and reiterates that it pays employees based on a combination of the regular rates and overtime rates listed in the contracts. [DE 39; 45].  NEL further contends that employers may use an expected daily sum with built in regular and overtime rates. [DE 45 at p. 8]. As support for this proposition, NEL cites to *Seraphin v. TomKats, Inc*., No. 11-CV-4382, 2013 940914 (E.D.N.Y. Mar. 11,

26

2013). In *Seraphin*, the defendant company paid an employee $200 per day based on twelve and fourteen-hour workdays. *Id*. at *1. The district court found that regular and overtime rates were built in to the $200 daily sum and granted defendant's motion for summary judgment. *Id*. at *2-5.

Although similar to *Seraphin*, this case is distinguishable in at least one crucial respect.  The defendant employer in *Seraphin* produced pay records to corroborate its argument that regular and overtime rates were built in to the employee's daily pay. *Id*. at *2.  Those records showed that on days when the plaintiff worked partial days – i.e., on days the employee did not work in excess of eight hours and thus should not have received an overtime rate – defendant paid the regular rate it claimed was part of the contract. *Id*.  The pay records made it clear that the defendant paid the plaintiff a particular sum for regular hours and a premium rate for hours in excess of eight – payments that became creditable toward overtime. *Id.; see also* 29 U.S.C. § 207(h)(2).

Here, nothing in the Defendant's Summary Judgment Motion suggests it ever paid employees the regular rate for the first eight hours and a premium rate for additional hours.  Defendant points to no evidence corroborating its claim.  And in fact, the pay records attached to Defendant's motion support Plaintiff's contention that NEL did not pay a premium.

27

One need look no further than Sanchez's pay records to see why. Although Sanchez's records do show – as NEL argued – that the compensation scheme does not amount to a true "day rate," the records also indicate that NEL did not pay a regular rate for the first eight hours and a premium rate for hours in excess of eight. This becomes apparent when one examines the week of October 18, 2016. During that week, NEL paid Sanchez less on October 20, 2016 because he worked fewer hours. [DE 45-1]. But although NEL paid Sanchez a smaller *daily* amount on days he worked fewer hours, the records suggest that Sanchez's *hourly rate* remained the same even when he did not work overtime hours. To see how, the Court will examine Sanchez's contract and pay and time records in a bit more detail.

Under the contract, NEL paid Sanchez an expected $135 per day based on a standard eleven-hour workday. [DE 39-1]. That is, if Sanchez worked the full eleven hours, he received the full amount. But if Sanchez worked less than a full day, he did not receive the full amount. [DE 45; 45-2]. The Court finds that NEL's records indicate as much.

NEL argues that Sanchez's expected daily amount had the following regular and overtime rates built in: a regular rate of $10.80 per hour and an overtime rate of $16.20 per hour. [DE 39-1 at p. 4]. The math checks out: if one works eight hours at $10.80 per hour and works three hours at $16.20 per hour, that person

28

would earn $135 for the day. And, as discussed, the FLSA allows employers to pay overtime on a daily basis and exclude that pay from the regular rate calculation. 29 U.S.C. §§ 207(e)(5), (h)(2).

Still, NEL's explanation falls short. First, unlike in *Seraphin*, NEL has presented no corroborating evidence that it ever actually paid employees based on regular and overtime rates. Second, Sanchez's work during the October 2016 week suggests NEL paid him at a rate not contained in the contract. Indeed, the records support the claim that NEL paid Sanchez *at the same* hourly rate for all hours worked. [DE 45-1]. On October 18 and 19, Sanchez received a full $135 for working a full eleven hours. [DE 45; 45-1]. As mentioned, this would fit with NEL's breakdown of regular and overtime rates contained in Sanchez's contract. [DE 39-1]. But on October 20, 2016, Sanchez worked 7.52 hours and received $101.25. [DE 45 at p. 6-7; 45-1]. This payment amount defies NEL's explanation of its compensation scheme. Because Sanchez worked fewer than eight hours that day, he would not have received his overtime rate. But NEL, which rounds to the nearest quarter day for employees, gave Sanchez credit for working three-quarters of an eleven-hour shift that day – or 8.25 hours. [DE 45 at p. 6-7]. Thus, Sanchez would be entitled to eight hours of regular pay and 0.25 hours of overtime pay based on NEL's compensation plan. Sanchez should have received $90.45 for eight

hours of regular time and 0.25 hours of overtime.[1] Instead NEL paid Sanchez $101.25 [DE 45 at p. 6-7].

NEL does not explain where the $101.25 amount came from. But the Court notes that $101.25 amounts to three-fourths of $135 – the daily rate assigned to Sanchez. [DE 39-1]. Thus, on a day Sanchez worked three-fourths of his expected shift, he received three-fourths of his expected daily pay. This falls in line with what Plaintiffs have alleged all along: that NEL does not pay overtime wages and instead prorates employees' expected daily sum based on the number of quarter days that employee worked.

Sanchez's records further suggest that NEL did not, in practice, pay overtime premiums contained in employees' contracts. NEL admits, for example, that Sanchez received $101.25 on October 20 for 8.25 hours worked. [DE 45 at p 6-7]. Thus, his hourly rate that day was $12.27 – a rate found nowhere in his contract.[2] And because he was given credit for 8.25 hours, Sanchez should have accrued a mere 0.25 hours of premium pay that day for hours worked in excess of eight. As explained above, however, this is plainly not what happened because had Sanchez earned eight hours of regular pay and 0.25 hours of overtime, he would have earned $90.45 for

---

[1] This represents the total sum from adding the product of Sanchez's regular rate multiplied by his regular hours to the product of Sanchez's overtime rate multiplied by his overtime hours. The equation looks like the following: ($10.80 x 8) + ($16.20 x 0.25) = $90.45
[2] This represents the quotient from dividing the amount Sanchez made that day ($101.25) by the number of hours NEL credited him for working (8.25) = $12.27 per hour

that day, not $101.25. When NEL paid Sanchez $135 for eleven hours worked on both October 18 and 19, he similarly made an average rate of $12.27.[3] Although NEL claims it breaks down the $135 daily sum into a regular rate for the first eight hours and an overtime rate for the next three hours, the fact that Sanchez earned the same rate – $12.27 per hour – on a days when accrued 0.25 hours of overtime and on days when he accrued three hours of overtime suggests that the regular and overtime rates are a fiction. Indeed, it suggests that employees earned at the same rate regardless of whether they worked hours in excess of eight per day. If true, those employees would not be receiving a premium rate under the FLSA. 29 U.S.C. § 207(e)(5); 29 C.F.R. § 778.202. And if the payments to employees were not premiums for hours in excess of eight, the payments must be included in calculating the regular rate. 29 U.S.C. § 207(e); 29 C.F.R. § 778.108.

Looking even closer at the week of October 18, the Court finds NEL's time and pay records do not match the rates listed in Sanchez's contract. Sanchez's time sheet indicates he worked 23:31 regular hours and 5:19 overtime hours that week. [DE 45-1]. Put differently, this amounts to 23.517 regular hours and 5.317 overtime hours. Given that NEL rounds to the next highest quarter day, NEL gave Sanchez credit for 24 regular hours (eight for each

---

[3] This represents the quotient of $135 (daily pay) divided by 11 (hours worked).

of the three days worked) and 6.25 overtime hours (three overtime hours each for October 18 and 19, and 0.25 for October 20).[4]  At the rates listed in Sanchez's contract, Sanchez should have received $259.20 in regular rate pay and $101.25 in overtime pay for a total of $360.45.[5]  But instead Sanchez earned $371.25 that week – $311.36 in regular pay, and $59.89 in overtime. [D 45-1 at p. 2]. With a regular rate of $10.80, Sanchez should receive $311.36 in regular pay for working 28.83 hours of regular time.[6] Similarly, with an overtime rate of $16.20, Sanchez should receive $59.89 in overtime pay when he works 3.69 hours of overtime.[7] But, as mentioned, Sanchez's time records for that week indicate he worked 23.517 regular hours and 5.317 overtime hours. [DE 45-1]. Put simply, NEL's number do not add up, and the Court cannot determine that Sanchez was ever actually paid according to the rates listed in his contract – or a premium at all.

Jeremy Thompson's records also present problems for NEL's explanation.  Thompson's contract lists a daily sum of $130 per day based on $10.40 of regular pay and $15.60 of overtime pay. [DE

---

[4] NEL admits Sanchez was given credit for eleven hours on October 18 and 19, and 8.25 hours on October 20. [DE 45 at p. 6-7].
[5] This represents the sum of the product of Sanchez's expected regular rate and regular hours and the product of his overtime rate and overtime hours, or ($10.80 x 24) + ($16.20 x 6.25) = $360.45.
[6] This comes from dividing Sanchez's regular pay the week of October 18 by his regular rate, or $311.36 / $10.8. The quotient represents the number of regular hours Sanchez must work at a rate of $10.80 to receive $311.36.
[7] This comes from dividing Sanchez's overtime pay by his overtime rate, or $59.89 / $16.20. This quotient represents the number of overtime hours Sanchez must work at a rate of $16.20 to receive $59.89.

39-1 at p. 6].   During the week of October 23, 2016, Thompson worked four days for a total of 32 regular hours and 10:44 in overtime (or 10.722) hours. [DE 43-10 at p. 2].  Given the regular and overtime rates in his contract, Thompson should have received $332.80 in regular pay and $187.20 in overtime pay that week for a total of $520.[8]  Records for that week show NEL did, in fact, pay Thompson a total of $520. [DE 43-10 at p. 1]. But NEL paid Thompson $416 for regular hours and $104 for overtime hours. [*Id.*]. This breakdown does not fit with the pay rates in Thompson's contract.  At a regular rate of $10.40 per hour, Thompson would have to work exactly 40 regular hours to make $416 for the week. Thompson would also have to work 6.67 hour of overtime at a rate of $15.60 per hour to make $104 of overtime pay.  Thompson's time sheet is clear: he did not work those hours that week. [DE 43-10]. NEL has not explained how it determined Thompson's pay breakdown, and the Court is not satisfied that the regular and overtime rates in his contract explain the payments.

In sum, the contracts, pay records, and time sheets create a genuine issue as to whether NEL built regular and overtime rates into the daily sum paid to employees or whether NEL paid employees the same rate regardless of the number of hours worked.  This issue is plainly material.  If NEL did, in fact, pay employees a premium

---

[8] Because NEL rounds to the nearest quarter day, it would have given Thompson credit for 12 overtime hours for the week. Thus, the overtime total amount is ($15.60 x 12) = $187.20.

for hours worked in excess of eight per day, then that amount is not a part of the regular rate calculation and NEL has already paid time-and-a-half creditable as overtime. 29 U.S.C. §§ 207(e)(5), (h)(2); 29 C.F.R. §§ 778.201, 778.202. But if NEL simply prorated daily sums and paid the same rate even for hours worked in excess of eight per day, then the total sum of the employees' weekly paychecks is included in the regular rate determination, the employees are entitled to a higher overtime rate, and NEL has not complied with the overtime requirements. 29 U.S.C. § 207(e), (h)(2); 29 C.F.R. §§ 778.108, 778.109. Because a genuine issue exists as to this material fact, Defendant's Motion for Summary Judgment is **DENIED.**

Finally, decertification is also not appropriate. First, discovery is yet to close and thus it would be premature. *See Monrore*, 860 F.3d at 396. Second, the claims of Group Four Plaintiffs remain the same as the rest of the class – that NEL prorated daily rates and never paid overtime premiums. Thus, Defendant NEL's Motion for Decertification as to Group Four Plaintiffs is **DENEID.**

### IV. CONCLUSION

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)  Defendant's Motion for Summary Judgment as to Dimitri Roskolov [DE 39] is **DENIED**. Plaintiff may substitute William Austin for Roskolov in this collective action.

(2)  Defendant's Motion for Summary Judgment or, in the alternative Decertification, as to Harry Sussman, Andy Dwyer, and Christopher Becknell is **DENEID**.

(3)  Defendant's Motion for Summary Judgment as to Patrick Johnson and Mark Comley is **GRANTED**

(4)  Defendant's Motion for Summary Judgment or, in the alternative Decertification, as to Joseph Sams is **DENIED AS MOOT**

(5)  Defendant's Motion for Summary Judgment or, in the alternative Decertification, as to Justin Sanchez, Jeremy Thompson, and Elijah Gawthorp is **DENEID**.

This the 25th day of October, 2017.

Signed By:

_Joseph M. Hood_

Senior U.S. District Judge

35