UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | | |
|---|---|---|
| THOMAS ADAMS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Case No. |
| | ) | 5:16-cv-98-JMH |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| NATURE'S EXPRESSIONS | ) | **AND ORDER** |
| LANDSCAPING, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

\*\*\*

Plaintiffs Ron Stewart and Frankie Anderson claim that their former employer, Defendant Nature's Expressions Landscaping, Inc., violated 29 U.S.C. § 215(a)(3) by retaliating against them for engaging in activity protected by the Fair Labor Standards Act ("FLSA"). Nature's Expressions denies the allegations and argues that Anderson and Stewart were terminated for legitimate, non-discriminatory reasons. Thus, Nature's Expressions filed Motions for Summary Judgment [DE 67, 68] on the retaliation claims. Anderson and Stewart responded [DE 77, 78] and Nature's Expressions replied [DE 82, 83], making this matter ripe for review. Both Motions for Summary Judgment [DE 67, 68] will be addressed in this Memorandum Opinion and Order. For the reasons stated herein, Defendant's Motion for Summary Judgment as to Plaintiff Ron Stewart [DE 67] is **GRANTED**, and Defendant's Motion for Summary Judgment as to Plaintiff Frankie Anderson [DE 68] is **DENIED**.

1

## I. PROCEDURAL AND FACTUAL BACKGROUND

Plaintiffs, former employees of Defendant Nature's Expressions, originally brought a collective action complaint in state court alleging that Nature's Expressions violated their rights under various provisions of the FLSA, 29 U.S.C. § 201, *et seq.*, and the Kentucky Wage and Hour Act, KRS § 337.285. [DE 1-1, Collective Action Complaint]. The matter was removed to this Court pursuant to 28 U.S.C. § 1331 on March 30, 2016. [DE 1, Notice of Removal]. Defendant then filed a corrected Answer on April 28, 2016. [DE 9-1, Corrected Answer].

Nearly two dozen former employees of Nature's Expressions opted in to this collective action as Plaintiffs after the Court certified the class. [DE 26]. After the Court denied Defendant's Motion for Summary Judgment [DE 48], the parties engaged in settlement negotiations.

The parties submitted a Joint Motion for Approval of Settlement to settle all overtime claims asserted by the named Plaintiffs on behalf of themselves and the class under 29 U.S.C. § 207 (Count I of the Complaint) and the individual overtime claims asserted by Plaintiffs Adam Allnut and John Heska under KRS 337.285 (Count II). [DE 69]. The Settlement Agreement and Release of Claims was approved by the Court on July 26, 2018. [DE 74, Order]. The settlement did not include the individual retaliation claims

asserted by Plaintiffs Frankie Anderson and Ron Stewart under 29 U.S.C. § 215(a)(3) (Count III). [DE 69, Joint Motion; 74, Order].

Defendant filed new Motions for Summary Judgment on the retaliation claims asserted by Anderson and Stewart. [DE 67, 68]. These new Motions are the subject of this Memorandum Opinion and Order. This dispute arises out of Plaintiffs' employment with Nature's Expressions.

Ron Stewart was employed by Nature's Expressions as a carpenter from September 3, 2015 to February 9, 2016. [DE 67-1, Nature's Expressions Memorandum in Support of Summary Judgment, p. 2; DE 67-2; DE 67-3]. The Nature's Expressions employment agreement, which Stewart signed, states that a typical work week is from 7:00 a.m. until 6:00 p.m., Monday through Friday and some Saturdays, with a 30-minute lunch period. [DE 67-2, Stewart Employment Agreement, p. 1, 3]. Stewart was initially compensated at a rate of $160 per day. [*Id.* at 2]. Additionally, Stewart was permitted five days of unpaid sick or personal leave per year, excluding paid holidays. [*Id.* at 3]. The employment agreement requires that time off requests "be cleared by [a] supervisor . . . in advance." [*Id.*]. Jonathan Donley was Stewart's direct supervisor. [*Id.* at 1].

Frankie Anderson was employed by Nature's Expressions as a mechanic from September 10, 2013 to March 14, 2016. [DE 78-1,

Nature's Expressions Employee File Cover Sheet; DE 68-3, Anderson's Termination Notice]. Anderson was tasked with building maintenance and repairing and maintaining equipment used by Nature's Expressions. [DE 78, p. 2]. Anderson's position required him to make "runs" to purchase materials or work on equipment at job sites. [DE 68-1, p. 3; DE 68-7, Flygstad Affidavit, p. 2].

Anderson was originally required to work from 7:00 a.m. until 5:00 p.m., with a thirty-minute lunch break. [DE 68-2]. Anderson was initially compensated at a rate of $160 per day. [*Id.*]. At some point, Anderson's day rate compensation was raised to $180 per day based on a typical fifty-hour work week. [DE 68-1, p. 13, 78, p. 7]. Nature's Expressions submits that the day rate was inclusive of overtime pay, which was calculated into the daily rate. [DE 68-1, p. 13]. Furthermore, Nature's Expressions asserts that Anderson's day rate was based on a base rate of $14.40 per hour.[1] [*Id.*].

---

[1] It is unclear, based on the record and pleadings, how Nature's Expressions calculated overtime pay into the day rate. While issues regarding overtime pay have been resolved by the parties, determining whether Anderson's pay was reduced is relevant to whether an adverse employment action occurred.

Even assuming, for the sake of argument, the facts as provided by Nature's Expressions are true [*See* DE 68-1, p. 13], prior to the March 4th employment agreement, Anderson was paid $180/day for a ten-hour work day. Thus, Anderson would presumably be paid his base rate of $14.40 for eight hours per day equaling $115.20 base pay per day. Thus, the additional $64.80 of his day rate is presumably compensation for two additional hours of overtime pay.

Dale Flygstad was Anderson's direct supervisor. [*Id.*]. Anderson testified that he had an agreement with Flygstad that permitted him to leave the Nature's Expressions premises for personal errands during the workday. [DE 68-3, pp. 37-39]. Nature's Expressions denies that Flygstad gave Anderson permission to run personal errands but acknowledges that Anderson did run personal errands during the work day. [DE 68-7, p. 2; DE 9-1, pp. 24-25]. Furthermore, Anderson was also using a master key to access the facility to complete his work after hours. [DE 68-7, p. 2; DE 78-2, pp. 39-42].

---

If so, Nature's Expressions paid $32.40 per hour for overtime pay. But time-and-a-half for two hours of overtime pay, based on the base hourly rate of $14.40, would be $21.60 per hour, not $32.40. Based on his base hourly rate of $14.40, Anderson would have been compensated a daily total of $158.40 for eight hours of base pay and two hours of overtime at time-and-a-half. But Anderson was paid $180/day or $900/week under the day rate compensation scheme. It is equally unclear how Anderson would have been compensated if he had worked six days in a week or worked more than fifty hours in a week.

Alternatively, Defendant's Answer states that Anderson was originally paid $14.54 per hour base pay for eight hours (totaling $116.32), $21.81 per hour of time-and-a-half overtime pay for two hours (totaling $43.62) and a paid thirty-minute lunch break, for a total original day rate of $160. [DE 9-1, pp. 14-15]. But this still doesn't compute. If true, this means that Anderson was only being paid six cents (0.06) for a paid thirty-minute lunch break when he should have been paid at least $7.27 for a half-hour of base pay, if not more based on the overtime rate. Additionally, this is inconsistent with Anderson's ten-hour work day. Defendant's Answer suggests that Anderson was working ten hours in addition to a thirty-minute paid lunch for a total of ten-and-a-half hours per day.

At some point during both Anderson's and Stewart's employment with Nature's Expressions, disputes arose pertaining to Nature's Expressions compensation scheme relating to overtime pay. Stewart testified that he questioned the compensation scheme on several occasions during his employment with Nature's Expressions, beginning as early as November 2015. [DE 67-5, Deposition of Stewart, pp. 27-29]. Stewart testified that he only had conversations about overtime compensation with his direct supervisor, Jonathan Donley. [Id. at 27-28]. Nature's Expressions and Donley deny that Stewart ever complained about overtime pay. [*See* DE 9-1, p. 18; DE 67-7, Donley Affidavit].

On January 11, 2016, Stewart sent a text message to Donley stating that he would not be at work that day because his truck would not start. [DE 67-5, Stewart Deposition, p. 22; DE 67-5, Exh. 2, Text Message]. Donley responded and told Stewart that he needed Stewart to come to work that day and told Stewart to "[p]lease find a way to work." [DE 67-5, Exh. 2]. Still, Stewart testified that he did not go to work on January 11th and that he did not respond to Donley's text message. [DE 67-5, pp. 22-23].

Eventually, sometime in January 2016, Stewart anonymously filed an administrative complaint with the Kentucky Labor Cabinet pertaining to unpaid overtime at Nature's Expressions. [DE 77, p. 2; see DE 67-5, pp. 31-33]. Stewart testified that he told his

direct supervisor, Jonathan Donley, that he had filed an administrative complaint with the Kentucky Labor Cabinet on February 5, 2016, but this information is not included in the original Complaint. [DE 67-5, pp. 35-36; see DE 1-1]. Additionally, Donley denies that Stewart told him that he had filed a complaint with the Kentucky Labor Cabinet. [DE 67-6, p. 2].

On Saturday, February 6, 2016, Stewart sent a text message to Donley informing Donley that he would not be at work on Monday, February 8, 2016, because he had an appointment with an eye doctor. [DE 67-5, pp. 23-24; DE 67-5, Exh. 3, Text Message]. Donley responded to Stewart's message, stating:

> Its [sic] important that you go to the eye doctor. But I will not be working Monday because of a planned PET scan and oncology appointment. Its [sic] not good for both of us to miss the same day. Time off requests need to be made 2 weeks in advance. Please reschedule your appointment for another day . . . .

[DE 67-5, Exh. 3]. Stewart testified that he did not call Donley or respond to his message. [DE 67-5, p. 24]. Furthermore, Stewart testified that he did not appear at work on February 8, 2016, even though his appointment did not take the entire day. [*Id.*].

The next day, on February 9, 2016, Stewart was terminated from his employment at Nature's Expressions for "[m]isconduct due to disregard of Nature's Expression's [sic] policies." [DE 67-2, Stewart Termination Notice]. Stewart refused to sign the

termination acknowledgement on the termination notice. [DE 67-5, p. 27; *see* DE 67-2].

Later that month, on February 24, 2016, a representative of the Kentucky Labor Cabinet visited Nature's Expressions. [DE 9-1, p. 20]. During the representative's visit to Nature's Expressions, Flygstad asked Anderson if he was happy with his position at Nature's Expressions. [*Id.*, DE 78, p. 2]. Plaintiff Anderson testified that Flygstad pointed out that the Labor Cabinet representative's car was in the company parking lot and that Anderson's friend and co-worker, Steven Atwood, had contacted the Labor Cabinet. [DE 78-2, pp. 43-44]. Additionally, Anderson testified that Flygstad asked if he had contacted the Labor Cabinet, to which Anderson responded, "no." [*Id.* at 44]. Nature's Expressions acknowledges that Flygstad asked Anderson if he was happy with his position but denies that Flygstad mentioned Steven Atwood contacting the Kentucky Labor Cabinet or that Flygstad asked Anderson if he had called the Labor Cabinet. [DE 9-1, pp. 20-21].

On February 25, 2016, Nature's Expressions announced an employee meeting to explain the overtime compensation scheme. [*Id.* at 21]. Flygstad personally informed Anderson about the meeting and stated that he wanted to have a private meeting with Anderson. [*Id.*].

The employee meeting was held the next day, on February 26, 2016. [*Id.*]. David Miller, a Nature's Expressions executive, led the meeting and informed employees that the Kentucky Labor Cabinet was reviewing Nature's Expressions records due to complaints that had been filed. [*Id.*]. Anderson asserts that he spoke up during the employee meeting and "said that it seemed like the math in Mr. Miller's overtime calculations could be done several different ways." [DE 78-3, Anderson Declaration, p. 2]. Nature's Expressions denies that Anderson spoke during the employee meeting. [DE 9-1, p. 22].

During the employee meeting, employees were polled as to whether they wanted to retain the current day rate compensation scheme with daily overtime premiums or transition to an hourly pay scheme. [*Id.*]. Nature's Expressions claims that "all employees who voted [at the employee meeting] did so in favor of the current [day rate] compensation scheme." [*Id.*]. Anderson asserts that he was not present during the portion of the employee meeting when the vote was held because he had left the meeting to take his daughter to school. [DE 78-3, p. 2].

After the meeting, Anderson returned to work and claims that he was asked by multiple employees to give his opinion on the compensation scheme for overtime pay. [*Id.*]. Anderson asserts

that each time he responded by saying that he felt Miller's math for calculating overtime pay was incorrect. [*Id.*].

Later that day, on February 26th, Anderson met privately with Flygstad. [*Id.* at 3, DE 9-1, p. 23]. Flygstad informed Anderson that employees had unanimously voted to keep the current compensation scheme for overtime pay. [DE 9-1, p. 23]. Furthermore, Flygstad informed Anderson that his current day rate pay scheme would be changed. [*Id.*]. Anderson asserts that Flygstad informed him that he would be paid at an unspecified hourly rate going forward. [DE 78-3, p. 3].

Additionally, Anderson asserts that he was approached again by Flygstad on February 26th, who inquired about "five other employees [who] had reported that [Anderson] had said Mr. Miller's math was not correct when calculating overtime." [*Id.*]. Anderson claims that Flygstad told him that he "needed to keep [his] mouth shut, and that the conversation about overtime pay needed to be shut down and come to an end." [*Id.*]. Anderson claims that Flygstad said that further conversation about overtime pay "would not be tolerated" and that Flygstad had told employees to report to him if they heard further talk about overtime pay. [*Id.*]. Nature's Expressions denies that this conversation took place. [DE 9-1, p. 23].

Subsequently, on March 4, 2016, Anderson was asked by Flygstad to return a diagnostic computer that he used while working on company vehicles and equipment. [*Id.* at 23-24]. On the same day, Anderson met with Lisa Keyes, a human resources employee for Nature's Expressions. [*Id.* at 24; *see* DE 78, p. 6]. Keyes directed Anderson to turn in his master key and informed him that he was no longer responsible for building maintenance. [DE 9-1, p. 24].

Additionally, during the meeting on March 4th, Keyes presented Anderson with an employment agreement, with new terms of employment. [Id. at 24; DE 68-1, p. 3; *see* DE 68-5, Anderson Employment Agreement]. The agreement limited Anderson's work week to forty hours per week and required that Anderson clock out for lunch. [DE 68-5, p. 1]. Additionally, the agreement required that Anderson's work be fulfilled between 7:00 a.m. and 6:00 p.m., Monday through Friday. [DE 68-5, p. 1]. The agreement also changed Anderson's pay from the previous compensation of "$180/day, which included both regular and overtime pay," to $22 per hour. [*Id.* at 2]. The agreement stated that "[a]ll overtime hours must be approved by [a] supervisor in advance." [*Id.* at 1]. Finally, Keyes explained that, as a condition of the agreement,

Anderson would be required to clock out each time he left the premises.[2] [*Id.* at 24].

Anderson testified that Keyes read the agreement to him and told him that he needed to sign it immediately. [DE 78-2, pp. 46-48]. Anderson claims that he was told by Keyes that he could not return to work until he signed the agreement. [*Id.* at 46-47]. Anderson testified that he called Flygstad to discuss the agreement and asked if he could take the agreement home to review it before signing it. [Id. at 47; DE 78-3, p. 4]. Anderson claims that Keyes told him that she could not go home before he signed the agreement. [DE 78-2, p. 47; DE 78-3, p. 4]. Anderson asserts that he had to pick up his daughter from school, so he signed the employment agreement and left for the day. [DE 78-2, p. 47; DE 78-3, p. 4]. Nature's Expressions denies that Anderson was pressured into signing the employment agreement. [DE 9-1, p. 25].

Then, Anderson was given the day off on Monday, March 7, 2016. [DE 9-1, pp. 26-25]. Subsequently, Anderson claims that he had multiple conversations with Flygstad, one in which the verses from the Bible were discussed. [*Id.* at 24-25; DE 78-3, pp. 4-5]. In one of those conversations, Anderson claims that Flygstad told him

---

[2] The requirement that Anderson clock out each time he left the premises does not appear on the face of the March 4th employment agreement, but the parties do not dispute that this was a requirement under his March 4th employment agreement. [See DE 9-1, p. 24; DE 68-5].

that he had heard Anderson was trying to get past and present employees of Nature's Expressions to join a lawsuit. [DE 78-3, p. 5]. Anderson claims that Flygstad asked if he had hired an attorney and Anderson asserts that he told Flygstad that he had hired an attorney and was in the process of filing a lawsuit against Nature's Expressions. [*Id.*]. In response, Anderson claims that Flygstad said that if Anderson filed a lawsuit he would not just be suing the company but also the owners and workers at Nature's Expressions. [*Id.*]. Finally, Anderson claims that Flygstad told him that he did not see how Anderson could continue as an employee with Nature's Expressions if he was suing the company. [*Id.*]. Finally, Anderson states that Flygstad told Anderson that he could keep his job if he agreed not to file a lawsuit against Nature's Expressions. [*Id.* at 6].

Later, on March 8, 2016, Flygstad sent a message to Anderson with a list of tasks that were to be completed that day. [DE 9-1, p. 27; DE 78-3, p. 6]. Anderson completed some of the tasks that were assigned to him, but he claims that his company credit card had been cancelled, which prevented him from completing the remaining tasks. [DE 78-3, pp. 6-7]. Anderson asserts that he was waiting on a co-worker, Quincy Hand, to return to work and go pick up parts so that Anderson could complete his work. [*Id.* at 7]. In the meantime, Anderson claims that he started to have back pain from an injury unrelated to his work at Nature's Expressions

and that he left work after telling multiple co-workers about his back pain. [DE 78-2, pp. 61-63]. Additionally, Anderson claims that a doctor encouraged him to stay off work until March 14, 2016. [DE 78-3, p. 7]. Nature's Expressions denies that the company credit card assigned to him was cancelled and denies that Anderson did not have access to the tools needed to complete the tasks assigned to him on March 8th. [DE 9-1, p. 27].

Finally, an exhibit to Anderson's Response to the Motion for Summary Judgment indicates that Anderson was terminated from his employment on March 14, 2016. [DE 68-3]. Even so, the complaint in the present case was filed on March 8, 2016, prior to Anderson's termination, and the pleadings have not been amended to include factual information or legal allegations arising from Anderson's termination. [*See* DE 1; DE 1-1]. Anderson's termination was discussed when Anderson was deposed. [DE 78-2, pp. 77-78]. Furthermore, Anderson's termination is mentioned in the Report of the Parties' Planning Meeting, which states: "Plaintiffs Stewart and Anderson claim they were unlawfully terminated by the Defendant, in violation of the FLSA, after complaining about overtime pay." [DE 12, p. 2].

## II.  Standard of Review

Summary judgment is appropriate only when no genuine dispute exists as to any material fact and the movant is entitled to

judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the burden to show that "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 825 (6th Cir. 2013) (internal quotations omitted). The Court construes all facts, including inferences, in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III. Analysis

**A. Whether Plaintiff Frankie Anderson's Claim for Retaliation Arising from his Termination is Properly Before the Court**

As an initial matter, Nature's Expressions argues that Plaintiff Anderson's claim of retaliation arising from his termination is not properly before the Court because he was terminated after the initial Complaint was filed and has made no effort to supplement the pleadings pursuant to Fed. R. Civ. P. 15(d). [*See* DE 68-1, pp. 7-9]. In response, Anderson states that his termination may be properly considered in this action because his termination does not constitute a new claim that would require supplemental pleading. [*See* DE 78, pp. 22-23]. Furthermore,

Anderson asserts that he identified his termination as an adverse employment action in discovery responses and the Report of the Parties' Planning Meeting [DE 12]. [*See id.* at 23-24].

Fed. R. Civ. P. 8(a)(2) states that "a pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court elaborated on the pleading standard in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), confirming that the "rule imposes legal and factual demands on the authors of complaints." 16630 Southfield Ltd. Partnership v. Flagstar Bank, F.S.B., 727 F.3d 502, 503 (6th Cir. 2013).

Still, in *Swierkiewicz v. Sorema N. A.*, the United States Supreme Court unanimously held that the prima facie case analysis under *McDonnell Douglas* is an evidentiary standard, not a pleading requirement. 534 U.S. 506, 510. Subsequent decisions in *Twombly* and *Iqbal* did not alter the holding in *Swierkiewicz* but reemphasized that "application of the *McDonnell Douglas* prima facie case analysis at the pleading stage 'was contrary to the Federal Rules' structure of liberal pleading requirements.'" *Keys v. Humana, Inc.*, 684 F.3d 605, 609 (6th Cir. 2012) (quoting *Twombly*, 550 U.S. at 570). Here, the "plausibility" standard in *Twombly* and *Iqbal* requires the Plaintiff to allege sufficient

"factual content," as opposed to "detailed factual allegations," from which a court, informed by its "judicial experience and common sense," could "draw the reasonable inference," *Iqbal*, 556 U.S. at 678, that Nature's Expressions terminated Anderson in retaliation for engaging in protected activity. 29 U.S.C. § 215(a)(3).

Even so, where "transactions, occurrences, or events aris[e] after the date of filing a complaint, a supplemental pleading must be filed." *Stewart v. Shelby Tissue, Inc.*, 189 F.R.D. 357, 361 (W.D. Tenn. 1999) (citing Fed. R. Civ. P. 15(d)); *see also*, *Dubuc v. Green Oak Twp.*, 312 F.3d 736, 750 (6th Cir. 2002) ("When the alleged manifestation of retaliatory animus occurs before adjudication on the merits of the initial suit, however, the victim is obliged to amend his or her complaint to add these new allegations."). The Federal Rules of Civil Procedure provide a procedural vehicle for supplementing pleadings, providing that "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d).

Ultimately, Anderson's termination is not properly before the Court for consideration. Anderson's termination is not simply new evidence that may support his claim but instead constitutes a separate, discrete act of retaliation upon which Anderson may

recover. *See Nat'l R.R. Passenger Corp. v. Morgan*, 526 U.S. 101, 114 (2002) ("Discrete acts such as termination . . . are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice." (internal quotation marks omitted)).

Anderson is correct that *Swierkiewicz* stands for the proposition that he is not required to prove a prima facie case of retaliation at the pleading stage. Still, even the liberal pleading standards in the Federal Rules require something more than nothing. Pleadings serve crucially important functions in civil litigation. Complaints inform adverse parties of the legal grounds and factual allegations underlying a lawsuit. Complaints also allow a defendant to gather information, prepare a defense, and initiate settlement negotiations.

Here, Anderson's termination is not before the Court, not due to *res judicata*, but simply because his termination is not included in any pleadings before the Court. Simply put, no information pertaining to Anderson's termination has been pleaded.

Anderson is correct that his termination is mentioned in his discovery responses and in the Report of the Parties' Planning Meeting, but this falls well short of the liberal pleading standards found in the federal rules. Anderson was terminated

after the original complaint was filed. The first time that Anderson presented his termination in any detail is in the Response to the Motion for Summary Judgment [DE 78], over two years after this lawsuit was filed. A response to a motion for summary judgment is not contemplated as a pleading under the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 7(a) (listing the only pleadings allowed in federal courts).

Anderson's termination, which occurred after this lawsuit was filed, is a discrete act of unlawful retaliation and Anderson was required to either supplement his pleading in this action to include the termination claim or file a separate lawsuit based on the alleged retaliatory termination. Anderson has done neither.

A complaint initiates a lawsuit, sets out a factual basis to support the claims, and defines the parameters of civil litigation. Other than passing mentions in discovery documents, Anderson's termination has been presented for the first time over two years after this lawsuit was initiated and less than two months before trial. Allowing Anderson to include a claim of retaliation based on his termination or use his termination to support his current retaliation claim would likely require additional discovery, resulting in delays, and would prejudice the defendant. Furthermore, allowing Anderson to include his termination at this stage in the litigation would render the pleading standards and supplemental pleading rules meaningless. Why would a party be

required to plead sufficient factual content to demonstrate that the pleader is entitled to relief if the pleader could simply introduce a new claim two months before trial? Why would the Federal Rules provide for supplemental pleading of any transaction, occurrence, or event that happened after the date of pleading if a party could simply raise a new occurrence or event two years after the commencement of a suit?

In the end, Anderson has failed to plead any, much less sufficient, factual content from which this Court, informed by its judicial experience and common sense, could draw the reasonable inference that Nature's Expressions terminated Anderson's employment in retaliation for engaging in protected activity because there is no mention of Anderson's termination in the pleadings. As such, the Court will not consider Anderson's termination in determining whether Anderson has demonstrated a prima facie claim of retaliation under the FLSA.

## B.    Prima Facie Retaliation Claims Under the FLSA

The anti-retaliation provision of the FLSA makes it unlawful for an employer to "discharge or in any other manner discriminate against [an] employee because such employee has filed [a] complaint or instituted . . . any proceeding under [the FLSA]." 29 U.S.C. § 215(a)(3). Where the plaintiff establishes direct evidence of discrimination, he may prevail without proving all the elements of

a prima facie case of discrimination. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."). Alternatively, the burden shifting analysis employed in *McDonell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to an FLSA retaliation claim where there is no direct evidence of discrimination. *Adair v. Charter Cty. of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006).

At the summary judgment stage, "the plaintiff must first submit evidence from which a reasonable jury could conclude that a prima facie case of discrimination has been established." *Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 Fed. App'x 524, 530 (6th Cir. 2011) (citing *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir.2007) (internal citations and quotation marks omitted)). To establish a prima facie case of retaliation, an employee must prove, by a preponderance of the evidence, that: "(1) he or she engaged in a protected activity under the FLSA; (2) his or her exercise of this [protected activity] was known by the employer; (3) thereafter, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action." *Id.; see also St. Mary's Honor Ctr. V. Hicks*, 509 U.S. 502, 506 (1993). A prima facie case of retaliation "creates a presumption that the employer unlawfully discriminated

against the employee." *Id.* (quoting *Hicks*, 509 U.S. at 506). "The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

If the plaintiff establishes a prima facie case, "the burden shifts to the defendant to set forth a legitimate, non-discriminatory reason for the adverse employment action." *Adair*, 452 F.3d at 489 (citing *McDonnell Douglas*, 411 U.S. at 802). At this stage, "[t]he defendant bears only the burden of production; the burden of persuasion remains with the plaintiff at all times." *Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 377-78 (6th Cir. 1991) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

If the defendant articulates a legitimate, non-discriminatory reason for the adverse employment action, "the plaintiff must then prove by a preponderance of the evidence that the defendant's proffered reasons were not its true reasons, but merely a pretext for illegal discrimination." *Adair*, 452 F.3d at 489. "To raise a genuine issue of fact as to pretext . . . the Plaintiffs must show that (1) the proffered reason had no factual basis, (2) the proffered reason did not actually motivate [the] action, or (3) the proffered reason was insufficient to motivate the action." *Id.* at 491 (citing *Cicero v. Borg-Warner Automotive, Inc.*, 280

F.3d 579, 589 (6th Cir. 2002)); *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 526 (6th Cir. 2008). Ultimately, "[t]he plaintiff must produce sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant[] . . . did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action." *Mickey*, 516 F.3d at 526 (internal quotations omitted). "To show an honest belief, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Id.* (internal quotations omitted).

The first potential showing to attack the credibility of the defendant's articulated reason for its actions requires that the proffered reason has no factual basis. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (*overruled on other grounds*, *Geiger v. Tower Automotive*, 579 F.3d 614 (6th Cir. 2009)). This first showing is "easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, *i.e.,* that they are factually false." *Id.* (internal quotations omitted). The second showing, that the proffered reason did not actually motivate the defendant's action, requires that "the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal." *Id.* (emphasis in original).

The second showing constitutes an indirect attack on the proffered reason where "the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant." *Id.* (emphasis in original). Like the first showing, the third showing is a direct attack that "consists of evidence that other employers, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Id.*

### (i) Plaintiff Ron Stewart's Retaliation Claim

Plaintiff Ron Stewart engaged in protected activity under the FLSA when he filed an anonymous complaint with the Kentucky Labor Cabinet pertaining to overtime pay, satisfying the first element of the *McDonnell Douglas* analysis. *See* 28 U.S.C. § 215(a)(3); *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 7 (2011).

Next, Stewart must demonstrate that a reasonable jury could find that it is more likely than not Nature's Expressions was aware that he engaged in activity protected by the FLSA. Stewart's administrative complaint with the Kentucky Labor Board was filed anonymously. Stewart testified that, on February 5, 2016, he personally told his direct supervisor, Jonathan Donley, that he

had filed an administrative complaint with the Kentucky Labor Cabinet pertaining to unpaid overtime hours. Of course, if Stewart told Donley that he had filed an administrative complaint, Nature's Expressions would be aware that Stewart had engaged in protected activity.

Even so, there is evidence that points the other way and suggests that Stewart did not tell Donley that he had filed a complaint. First, the allegation that Stewart told Donley about the administrative complaint is not included in the initial Complaint. [See DE 1-1]. One would imagine that, if true, such a material fact would be included in the initial pleadings to support Stewart's claims. Second, Donley's affidavit expressly denies that Stewart ever told Donley that he had filed an administrative complaint with the Labor Cabinet. [DE 67-7, p. 2].

Additionally, Stewart's assertion that he told Donley that he filed the administrative complaint is contradicted by Plaintiff Anderson's testimony. Anderson testified that, in late February, after Stewart had been terminated, Nature's Expressions suspected that Anderson's friend and colleague Steven Atwood had filed the complaint with the Kentucky Labor Cabinet. [DE 78-2, pp. 42-45; DE 78-3, p. 1]. Additionally, Anderson testified that Nature's Expressions also suspected him of filing the complaint with the Labor Cabinet. [DE 78-2, pp. 42-44]. Stewart's claim, that he

told Donley in early February that he had filed an administrative complaint with the Kentucky Labor Cabinet, seems questionable if, later that month, Nature's Expressions suspected that Atwood or Anderson had filed a complaint with the Kentucky Labor Cabinet. Thus, some evidence in the record suggests that Stewart did not tell Donley that he had filed a complaint against Nature's Expressions.

Regardless, at the summary judgment stage, the evidence is viewed in the light most favorable to the nonmoving party. See *Nguyen*, 229 F.3d at 562. Stewart testified that he personally told Donley that he had filed an administrative complaint. Here, the jury is in the best position to determine whether Stewart's testimony is credible. At trial, the jury will have the ability to view the demeanor of witnesses, hear cross examination, and review all the evidence before making a determination about the credibility of a witness.

Additionally, Stewart may rely on circumstantial evidence to create an inference that Nature's Expression was aware that he had filed an administrative complaint. Circumstantial evidence may be used to support a reasonable inference that the decision maker had knowledge that an employee engaged in protected activity if the evidence is comprised of "specific facts" and offers more than "flights of fancy, speculations, hunches, intuitions, or rumors

about matters remote from [personal] experience." *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002) (quoting *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991)). The record reflects that Stewart was terminated on February 9, 2016, four days after he allegedly told Donley that he had filed a complaint with the Labor Cabinet. Additionally, Donley denied a time-off request made by Stewart on February 6th, one day after Stewart allegedly told Donley about his complaint. This adverse treatment could serve as circumstantial evidence to support Stewart's claim that Nature's Expressions was aware that he had filed an administrative complaint.

A reasonable fact finder, after hearing testimony and evidence presented at trial, may find that it is more likely than not that Stewart had told Donley that he filed an administrative complaint pertaining to overtime wages and that Nature's Expressions was aware of this protected activity. As such, Stewart has met the second element of a prima facie case of retaliation.

Third, Stewart's termination clearly constitutes a materially adverse employment action under the FLSA. *Adair*, 452 F.3d at 490. ("Employment actions qualifying as materially adverse include termination of employment . . . ." (internal quotations omitted)).

Fourth, and finally, Stewart has presented sufficient evidence from which the jury could draw an inference that he would

not have been terminated if he had not filed an administrative complaint with the Kentucky Labor Cabinet.

To demonstrate a causal connection, Stewart "must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had" Stewart not engaged in the protected activity. *See Allen v. Michigan Dep't of Corrections*, 165 F.3d 405, 413 (6th Cir. 1999). As a general matter, temporal proximity between the materially adverse employment action and the protected activity, standing alone, is insufficient to establish the causation element in a retaliation claim. *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007); *Adair*, 452 F.3d at 490-91; *Nguyen*, 229 F.3d at 566.

Even so, in a rare case, "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey*, 516 F.3d at 525. In such cases, where an employer immediately retaliates against an employee upon learning of his protected activity, "the employee would be unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively, and little other

than the protected activity could motivate the retaliation." *Id.* Alternatively, where some time passes between the employer learning of the protected activity and the adverse employment action, "the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.*; *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 365 (6th Cir. 2001).

Here, it is unnecessary to determine whether temporal proximity alone can establish a causal connection because Stewart has demonstrated both temporal proximity and evidence of other retaliatory conduct. Stewart claims that he told his direct supervisor that he had filed an administrative complaint on February 5th and was terminated just four days later. Furthermore, Stewart's request for time off work was denied after he allegedly told Donley that he filed an administrative complaint. The temporal proximity between the alleged notification of protected activity and the adverse employment action, paired with the denial of the time-off request, may lead a reasonable jury to infer that there is a causal connection between the Nature's Expressions learning of Stewart's protected activity and Stewart's termination. Here, Stewart's burden "is easily met" and he has "proffer[ed] evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action."

*Nguyen*, 229 F.3d at 565-66 (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858 (6th Cir. 1997)).

Ultimately, viewing the facts in the light most favorable to Stewart, he has demonstrated that there is sufficient evidence from which a reasonable jury could find that the four elements of a prima facie case of discrimination have been by a preponderance of the evidence. Thus, the burden now shifts to Nature's Expressions to articulate a legitimate, non-discriminatory reason for Stewart's termination.

In response, Nature's Expressions claims that the reason that Stewart was terminated was due to "disregard of Nature's Expression's [sic] policies." [*See id.*]. Specifically, Nature's Expressions claims that it terminated Stewart "due to his complete lack of regard for its attendance policy, and for his willful disregard of the instruction of his supervisor, Jonathan Donley, to report to work on February 8, 2016." [DE 67-1, pp. 10-11]. Thus, Nature's Expressions has articulated a legitimate, non-discriminatory reason for Stewart's termination.

In response, Stewart asserts that this stated reason for termination is pretext because he had been granted time-off requests with less than two weeks' notice in the past and that the record indicates an atmosphere where Nature's Expressions was

regularly retaliating against employees that filed complaints about overtime pay. [See DE 77, pp. 10-13].

But here, the articulated legitimate reason for Stewart's termination has a factual basis. On February 6, 2016, Stewart sent his direct supervisor, Jonathan Donley, a text message stating that he would not be at work on Monday due to an appointment with an eye doctor. [DE 67-5, pp. 23-4; DE 67-5, Exh. 3]. Donley responded to Stewart via text message and told Stewart that time-off requests needed to be made two weeks in advance and instructed Stewart to reschedule his appointment on February 8th. [DE 67-5, pp. 23-4; DE 67-5, Exh. 3]. Stewart neither responded to Donley nor reported for work on the 8th. [DE 67-5, pp. 24-25]. As a result, Nature's Expressions terminated Stewart's employment on February 9th, 2016. [DE 67-3].

Stewart admits that he disregarded the written leave policy. [DE 67-5, pp. 23-25]. Furthermore, Stewart admits that he did not respond to Donley or report to work as instructed. [*Id.*]. Thus, Stewart has failed to demonstrate that the proffered legitimate reasons for his termination lack a factual basis.

Still, Stewart claims that past conduct established an informal policy for time-off requests at Nature's Expressions. [*See* DE 77, pp. 10-13]. Thus, Stewart claims that a reasonable jury could conclude that his absence from work on February 8th did

not actually motivate the Defendant to terminate his employment because there was an informal policy in place that allowed employees to take time off work with less than two weeks' notice. [See DE 77, pp. 10-11].

But Stewart cannot meet the second showing to attack the credibility of the proffered reason for his termination because he has not admitted that the factual basis underlying the explanation could motivate his dismissal. Stewart admitted that he did not respond to Donley's text message denying his time-off request and that he failed to report to work on February 8th, but he has not admitted that his failure to comply with the notice requirement or his failure to respond to Donley could have motivated his dismissal. [See DE 77; DE 77-2, pp. 23-27]. Again, the second showing attacking the credibility of an employer's proffered legitimate reason for an adverse employment action is an indirect attack that requires the plaintiff to admit that the factual basis underlying the employer's proffered explanation is true and could motivate dismissal. *Manzer*, 29 F.3d at 1084. In the present case, Stewart flatly denies that his absence from work and failure to comply with the notice policy motivated his dismissal.

Furthermore, even assuming that Stewart had acknowledged that the proffered explanation could have motivated his dismissal, Stewart has failed to show circumstances which tend to prove that

an illegal motivation was more likely the cause of his termination than the explanation offered by Nature's Expressions. Stewart claims that past instances where his time-off requests were approved without two weeks' notice suggests that it is more likely that he was fired due to an illegal motivation instead of due to violation of company policy. But Stewart was terminated, not only due to disregard of the written time-off policy, but also because he failed to report to work when he was told to do so by his supervisor and failed to communicate with his supervisor or otherwise explain his actions. [See DE 67-3, DE 67-5, pp. 23-26]. Stewart has failed to advance sufficient evidence that demonstrates that the decision to terminate him was not motivated due to his insubordination or failure to communicate. When asked why he did not respond to Donley's denial of his time-off request, the best response that Stewart could muster was, "I just didn't." [*Id.* at 25].

As a result, Nature's Expressions has demonstrated that it fired Stewart due to his failure to comply with company policy in addition to insubordination and failure to communicate with his supervisor. Stewart has not presented sufficient evidence from which a reasonable finder of fact could conclude that his insubordination and failure to communicate did not actually motivate his termination. As such, Stewart has failed to meet the second showing to demonstrate pretext.

33

Finally, Stewart has failed to meet the third showing to demonstrate pretext, which requires evidence that other employees were not terminated or retaliated against even though they engaged in substantially identical conduct. Stewart has not provided evidence that other employees failed to comply with the written notice policy or disregarded an instruction from a superior and kept their jobs. Thus, there is no evidence of disparate treatment that would suggest that other employees who engaged in the same conduct would not have also been terminated.

Thus, Nature's Expressions had legitimate reasons, based on violations of company policy and insubordination, to terminate Stewart. Here, there is insufficient evidence to allow a reasonable jury to conclude that the stated reasons for Stewart's termination are pretext.

Ultimately, Stewart has presented sufficient evidence, while attenuated at times, to meet the low bar for demonstrating a prima facie case of retaliation. But here, Nature's Expressions has articulated a legitimate, non-discriminatory explanation for Stewart's termination and Stewart has failed to prove that the proffered reason is pretext. Therefore, even when construing the facts in the light most favorable to Stewart, there is no genuine dispute of material fact such that a reasonable jury could return

a verdict for Stewart and summary judgment is granted to Nature's Expressions on Stewart's retaliation claim.

### (ii) Plaintiff Frankie Anderson's Retaliation Claim

Plaintiff Frankie Anderson did not file a formal complaint pertaining to violations of the FLSA before he joined the Complaint initiating this lawsuit. Still, Anderson's oral complaints pertaining to calculation of overtime pay constitute protected activity under the FLSA. The FLSA protects oral complaints so long as the complaint is "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute . . . ." *Kasten*, 563 U.S. at 14. Additionally, even an informal complaint may constitute protected activity under the FLSA. *Moore v. Freeman*, 355 F.3d 558, 562 (6th Cir. 2004).

Here, Anderson testified that, on February 24, 2016, he was asked by his supervisor, Dale Flygstad, whether he had filed an administrative complaint with the Kentucky Labor Cabinet. [DE 78-2, pp. 43-44]. Anderson asserts that he truthfully told Flygstad that he had not filed a complaint with the Labor Cabinet. [*Id.* at 44].

The next day, on February 25, 2016, Flygstad personally informed Anderson about an employee meeting to discuss calculation of overtime pay and asked for a private meeting with Anderson.

[DE 9-1, p. 21]. Furthermore, Anderson asserts that he spoke up at the employee meeting, which was held on February 26, 2016, and "said that it seemed like the math in Mr. Miller's overtime calculations could be done several different ways." [DE 78-3, p. 2]. Then, after the meeting, Anderson claims that he was asked by multiple employees to give his opinion on the overtime pay scheme. [*Id.*]. Anderson asserts that he responded that he felt Miller's math for calculating overtime pay was incorrect. [*Id.*].

Later that day, Anderson had a private meeting with Flygstad. [*Id.* at 3, DE 9-1, p. 23]. During the private meeting, Flygstad informed Anderson that his current day rate pay scheme would be changed. [DE 9-1, p. 23]. Furthermore, Anderson claims that he was approached again by Flygstad on February 26th to inquire about five employees that had stated that Anderson said that he thought Miller's math pertaining to overtime pay was incorrect. [DE 78-3, p. 3]. Anderson claims that Flygstad told him to "keep [his] mouth shut" about overtime pay and that further conversations about overtime pay "would not be tolerated." [*Id.*].

Nature's Expressions admits that Flygstad asked Anderson if he was happy with his position at Nature's Expressions, that Flygstad personally informed Anderson about the employee meeting, and that Flygstad met privately with Anderson after the employee meeting to inform Anderson that his compensation scheme would be

changed. [DE 9-1, pp. 20-21, 22]. Otherwise, Nature's Expressions denies that Flygstad asked Anderson if he filed a complaint, that Anderson spoke up during the employee meeting, that Anderson was ever threatened, or that Nature's Expressions had knowledge of Anderson's alleged conversations with his co-workers about overtime pay. [See DE 9-1, pp. 20-24].

Still, Anderson's testimony is supported by circumstantial evidence that suggests that he did in fact make informal complaints about overtime pay and that Nature's Expressions was aware of his grievances. When a representative from the Kentucky Labor Cabinet visited Nature's Expressions, Flygstad asked Anderson if he was happy with his job. Flygstad also asked Anderson for a private meeting to discuss overtime wages. Furthermore, Anderson was informed that his pay rate would be changed during the private meeting. The record indicates that Anderson is the only employee with whom Flygstad met privately and the only employee that received a different pay rate after the meeting regarding overtime pay.

Ultimately, Anderson's testimony, paired with the circumstantial evidence in the record, indicate that Flygstad had a heightened interest in Anderson and suggest that Flygstad was concerned that Anderson was aggrieved or that he had filed a complaint with the Kentucky Labor Cabinet. More to the point, the

evidence suggests that Anderson made oral, informal complaints, that made it "sufficiently clear and detailed for [Nature's Expressions] to understand [the complaints], in light of both content and context, as an assertion of rights protected by the statute . . . ." *Kasten*, 563 U.S. at 14.  As such, a reasonable jury could find it more likely than not that Anderson made oral complaints about the overtime compensation scheme at Nature's Expressions and that Flygstad was aware of Anderson's complaints, satisfying the first and second elements of the *McDonell Douglas* analysis.

Next, Anderson must demonstrate that an adverse employment action occurred.  Actions that constitute materially adverse employment actions include: "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Adair*, 452 F.3d at 490.  Here, the March 4th employment agreement constitutes a materially adverse employment action under the *McDonell Douglas* standard.

Prior to March 4, 2016, Anderson was paid $180 per day or $900 per week.  The terms of the March 4th employment agreement switched Anderson from the $180 daily rate to a $22 hourly rate. [See DE 68-5].    Nature's Expressions submits that this is not a materially adverse employment action because Anderson's base pay

rate of $14.40 per hour was increased under the employee agreement to $22.00 per hour. [*See* DE 68-1, p. 13]. Not so fast. Nature's Expressions is correct that "[w]orking the same fifty-hour workweek as he was previously expected to work, Anderson would have earned $1,210.00 [per week] under the new agreement." [Id.]. The rub is that under the March 4th agreement, Anderson was only permitted to work forty hours per week and was required to seek approval to work any additional overtime hours. [See DE 68-5, p. 1]. Prior to the March 4th agreement, Anderson worked fifty hours per week in a typical week. Thus, the agreement on March 4th effectively cut Anderson's hours by ten hours per week, which reduced his pay. Before the March 4th employment agreement, Anderson made $180 per day or $900 week. Because of the employment agreement on March 4th, Anderson was only permitted to work forty hours per week, at $22 per hour, making his weekly pay $880.

Nature's Expressions argues that this reduction in hours is irrelevant because Anderson never sought approval to work overtime under the agreement, but this misses the point. The main point is that the March 4th employment agreement required Anderson to seek permission to work overtime and thus required Anderson to seek permission to make more than $880 per week. Ultimately, the employment agreement reduced Anderson's pay because it allowed him to only work forty hours per week and required him to seek

permission to work overtime, effectively reducing his weekly take-home pay by twenty dollars.

Furthermore, the employment agreement also significantly reduced Anderson's responsibilities and resulted in a material loss of benefits.  Before the agreement, Anderson had the ability to use a master key to complete his work after hours.  After the March 4th agreement, Anderson lost this privilege.  The agreement also relinquished Anderson's responsibility for building maintenance at Nature's Expressions.  Finally, Anderson asserts that he originally had the ability to make runs and run personal errands to take his daughter to school.  The employment agreement required that Anderson complete his work within set hours and required that he clock in and out each time he left the premises. Thus, the employment agreement resulted in significant and material changes to Anderson's previous responsibilities and benefits.

Ultimately, the March 4th employment agreement constitutes a materially adverse employment action because it effectively reduced the hours that Anderson could work without permission, lowered his weekly take-home pay, and reduced his responsibilities and benefits in a material way.

Lastly, as was previously discussed, Anderson "must produce sufficient evidence from which an inference can be drawn that the

adverse action would not have been taken had" Anderson not engaged in the protected activity. *See Allen v. Michigan Dep't of Corrections*, 165 F.3d 405, 413 (6th Cir. 1999).

Here, Anderson has demonstrated a sufficient connection between the adverse employment action, the March 4th employment agreement, and the protected activity, the complaints about overtime pay. Anderson claims that he first complained about overtime pay calculation during the employee meeting on February 26th. Anderson was also the only employee with whom Flygstad met personally and was similarly the only employee whose wages were changed after the meeting regarding overtime pay. Prior to the March 4th agreement, Anderson had no formal, written employment agreement with Nature's Expressions. Anderson testified that he had an informal agreement with Flygstad that allowed him to make runs during the work day and attend to personal errands. Nature's Expressions denies that such an agreement existed, but it is clear from the record that Anderson was regularly making runs for supplies and leaving work to attend to personal errands prior to March 4, 2016. Nature's Expressions has failed to demonstrate why Anderson's runs became a problem in early March leading to the new terms in his employment agreement.

Of course, it may be true that the March 4th employment agreement was intended as a modified employment agreement. But a

reasonable jury could see it differently and conclude that the March 4th employment agreement would not have been presented to Anderson had he not complained about overtime pay. Here, there is sufficient evidence to lead a reasonable jury to infer that the new terms of employment contained in the March 4th employment agreement would not have been presented to Anderson if he had not complained about overtime pay in late-February.

Thus, Anderson has presented sufficient evidence that could lead a reasonable fact finder to conclude that he has demonstrated all four elements of a prima facie case of discrimination by a preponderance of the evidence. Since Anderson has demonstrated a prima facie case of retaliation, the burden shifts to Nature's Expressions to articulate a legitimate, non-discriminatory reason for the adverse employment action.

Nature's Expressions asserts that the March 4th employment agreement was a "modified employment agreement . . . due to Anderson's increasing unavailability and decreasing work performance during his work hours." [DE 68-1, p. 15]. Thus, Nature's Expressions has successfully articulated a legitimate, non-discriminatory reason for the March 4th employment agreement.

Now, the burden shifts back to Anderson to demonstrate that the proffered legitimate reason advanced by Nature's Expressions is mere pretext. First, the articulated reason appears to be

supported by a factual basis. Anderson acknowledged that he regularly made runs and attended to personal errands during the work day but claims that he did so with Flygstad's permission. [DE 68-3, pp. 37-39].

Second, Anderson cannot meet the second showing to attack the credibility of the proffered explanation because, like Stewart, Anderson has not admitted that the proffered reason could have motivated the adverse employment action. In fact, Anderson argues the opposite, claiming that the factual basis underlying the proffered explanation could not have motivated Nature's Expressions to present him with new terms of employment in the March 4th employment agreement. [See DE 78].

But here, Anderson has met the third showing by demonstrating that he was treated differently than other employees that engaged in substantially identical behavior. The record indicates that multiple employees had grievances with the overtime compensation scheme at Nature's Expressions. Additionally, Nature's Expressions was aware that employees had complained about overtime pay and held an employee meeting to address the issue. Even so, the record indicates that Anderson is the only employee with whom Flygstad met privately after the employee meeting to discuss the overtime compensation scheme. More important, Anderson is the only employee at Nature's Expressions whose compensation scheme

was changed from the day rate to an hourly wage after the employee meeting. These instances of disparate treatment could lead a reasonable jury to conclude that Anderson was presented with the new terms of employment in the March 4th agreement as punishment for speaking out about the overtime compensation scheme and not as an employee improvement plan or modified employment agreement.

Taking Nature's Expressions at its word, the modified employment agreement increased Anderson's hourly wage but required him to perform less work. But a reasonable jury would be justified in concluding that it does not make sense that Nature's Expressions would pay Anderson more money to do less work under a modified employment agreement if they were unhappy with Anderson's availability during normal business hours. Thus, there is sufficient evidence from which a reasonable fact finder could conclude that Anderson's unavailability during the work day was insufficient to motivate Nature's Expressions to alter the terms of Anderson's employment through the March 4th agreement.

Ultimately, Anderson has shown a prima facie case of retaliation by establishing, by a preponderance of the evidence, that there is a genuine dispute at all four stages of the *McDonell Douglas* analysis. Additionally, Anderson has demonstrated that the proffered legitimate explanation for the new terms of his employment was pretext because he was treated differently than similarly situated employees. As such, a genuine issue of material

fact exists as to whether Nature's Expressions retaliated against Anderson for engaging in protected activity under the FLSA. Resolution of this material fact is left to the jury and the motion for summary judgment pertaining to Anderson's retaliation claim must be denied.

## IV. Conclusion

In early 2016, disagreements about overtime pay boiled over and caused a stir at Nature's Expressions. The FLSA makes it unlawful to retaliate against employees who engage in protected activity under the Act. Here, Nature's Expressions has articulated a legitimate, non-discriminatory explanation for Stewart's termination and Stewart has failed to demonstrate that the articulated reason for his termination is pretext. Alternatively, while Anderson's termination is not before the Court, Anderson has demonstrated a prima facie case of retaliation arising from the March 4th employment agreement and has presented sufficient evidence that could entitle a reasonable jury to conclude that the articulated legitimate reason for the adverse employment action is pretext.

Accordingly, **IT IS ORDERED**:

(1) Defendant's Motion for Summary Judgment as to Plaintiff Ron Stewart's retaliation claim [DE 67] is **GRANTED**;

(2) Defendant's Motion for Summary Judgment as to Plaintiff Frankie Anderson's retaliation claim [DE 68] is **DENIED**.

This the 14th day of September, 2018.



Signed By:

*Joseph M. Hood*

Senior U.S. District Judge